COURT OF 
APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-01-397-CV
 
 
DALLAS FIRE INSURANCE COMPANY                                      APPELLANT
 
V.
 
TEXAS CONTRACTORS SURETY &                                          APPELLEES
CASUALTY AGENCY, TOM YOUNG,
AND FRED THETFORD
  
------------
 
FROM THE 348TH DISTRICT COURT 
OF TARRANT COUNTY
 
------------
 
OPINION
 
------------
I. INTRODUCTION
        This 
suit involves a dispute over commissions to be paid under an agency agreement. 
Appellant Dallas Fire Insurance Company appeals from a judgment awarding actual 
damages and attorney’s fees against it under article 21.21 of the Insurance 
Code, based upon jury findings of misrepresentations in violation of the DTPA, 
and denying recovery on Dallas Fire’s counterclaim against the agents for 
breach of fiduciary duty.
        We 
hold that: the dispute arose out of the “business of insurance” for purposes 
of article 21.21; Appellees’ claims under the DTPA as incorporated into 
article 21.21 were actionable as tort claims for misrepresentation and were not 
merely a contract dispute over interpretation of the agreement; legally and 
factually sufficient evidence supports the jury’s findings; and Dallas 
Fire’s causes of action as pleaded by its counterclaim and third-party claim 
were barred by limitations. Therefore, we will affirm.
II. FACTS
        A. 
TCSCA Agency
        Fred 
Thetford and Tom Young formed Texas Contractors Surety and Casualty Agency (“TCSCA”) 
in 1990, to sell contract surety bonds on behalf of Eagle Insurance Company 
(“Eagle”). Both agents had substantial backgrounds in banking and financial 
services. TCSCA was appointed by Eagle as a subagency under the Harris & 
Lightfoot managing general agency to sell performance, maintenance, and payment 
bonds to construction contractors primarily for commercial and public projects.
        Dallas 
Fire is an insurance company owned by Mike Milam and a partner through their 
joint ownership of its parent company, Mid-American Indemnity Company. Dallas 
Fire specializes in commercial general liability insurance. Milam is president 
and treasurer, as well as half-owner, of Dallas Fire. In 1993, Eagle became 
financially impaired and ceased doing business. Steve Dahlbo, who had served as 
president of Eagle for ten years, was hired by Milam to be a consultant for 
Dallas Fire’s parent company because of his previous experience as president 
of Eagle.
        B. TCSCA Agency Agreement
        When 
Eagle ceased doing business, the Harris & Lightfoot agency asked Dahlbo to 
find a home for their surety bond business. Steve Dahlbo was able to move their 
book of business to Dallas Fire. Milam thereafter hired Dahlbo to be the 
Marketing Director of Dallas Fire, primarily to run its newly acquired surety 
bond business.
        TCSCA 
at first remained a subproducer under Harris & Lightfoot’s new agency 
agreement with Dallas Fire. In the fall of 1993, however, Dallas Fire approached 
TCSCA to take over Harris & Lightfoot’s agency relationship with Dallas 
Fire. On December 1, 1993, TCSCA entered into an Agency-Company Agreement 
directly with Dallas Fire.
        Initially, 
TCSCA agreed to a 20 percent straight commission, substantially lower than its 
agreed commission as subagent for Eagle, to be supplemented by a contingent 
profit commission as an incentive for better quality business and to provide an 
opportunity for a greater return. After further negotiations, TCSCA and Dallas 
Fire reached an amended agreement for commissions, reduced to writing and dated 
December 28, 1994, retroactive to December 1, 1993. The amended agreement, as 
reflected in a written Agency Commission Schedule, provided for a straight 
commission of 27.5 percent and an additional “contingent profit commission” 
to be computed by a formula. Milam was the signatory for Dallas Fire on both the 
Agency-Company Agreement with TCSCA and the Agency Commission Schedule.
        C. The Contingent Profit Commissions
        The 
formula specified in the Agency Commission Schedule ultimately negotiated by the 
parties called for the contingent profit commission to be calculated as 5 
percent of all earned bond premiums, decreasing on a sliding scale by ½ percent 
for each 1 percent increase in the loss ratio above 20 percent. At a loss ratio 
of 30 percent or more, no commission was owed. The loss ratio was to be computed 
in the following manner:
1.The sum of paid [and] unpaid 
loss, loss adjustment, and legal expense, plus
 
2.Incurred But Not Reported 
Losses equal to 5% of Enforce Premiums,
 
3.Divided by premiums earned.
        The 
Agency Commission Schedule required Dallas Fire to compute the contingent profit 
commission on an annual basis, with any contingent profit commission due TCSCA 
delivered within 30 days of the end of each calendar year. The commission was 
subject to change if Dallas Fire’s losses and bond expenses increased over 
time. By letter agreement, the parties also provided for Young to receive an 
equal amount as a contingent profit commission annually.
        For 
the year ending December 31, 1994, TCSCA received $11,333.00 in contingent 
profit commission, with Young receiving an equal amount. The 1994 contingent 
profit commission was approved by Milam before payment to TCSCA and Young. TCSCA 
provided the figures for the bonds issued and premiums collected but had no 
involvement in the calculation of the commission amounts. For the next year, 
ending December 31, 1995, the contingent profit commission was computed to be 
$58,557.33 for TCSCA with a like amount for Young and was again approved by 
Milam. Dallas Fire faxed calculations for the commission amounts for 1995, due 
January 10, 1996, to TCSCA, but deposited the funds in escrow with the consent 
of TCSCA and Young, because the agency by that time was contemplating 
discontinuing its business with Dallas Fire, and the parties understood that the 
figures could change based upon losses in the process of adjustment.
        In 
the fall of 1995, TCSCA had learned that Dallas Fire lacked the capital and 
surplus to become “Treasury listed” as would be required by proposed 
legislation affecting bonds for public construction projects. With the 
legislation pending, public works entities began insisting on Treasury listed 
construction bonds, limiting TCSCA’s market for further potential sales of 
Dallas Fire performance and payment bonds. TCSCA advised Dallas Fire in February 
1996 that it intended to cease doing business under the Agency-Company 
Agreement. In June 1996, TCSCA moved its business to another company, American 
Reliable Insurance Company, and Dallas Fire ceased writing bonds.
D. Change in Calculating Commissions
        It 
was undisputed that, for both 1994 and 1995, in calculating the amount of the 
contingent profit commissions due, the only expenses Dallas Fire included in the 
formula as “loss adjustment expense” were amounts it actually had paid to 
third parties such as outside adjusting firms and legal expense for claims on 
bonds sold by TCSCA. However, in 1996, Dallas Fire learned from a new auditor 
that it could include “unallocated loss adjustment expenses” in its annual 
statements with the Texas Department of Insurance (“TDI”). Dallas Fire 
witnesses described “unallocated loss adjustment expense” as a prorated 
portion of all amounts chargeable to a claim including in-house adjusters’ 
salaries, actuaries’ salaries, secretarial services, benefits to employees, 
office rent, heating, air conditioning, utilities, computers, telephones, 
postage, accounting support, and other overhead expenses.
        Dallas 
Fire included “unallocated loss expense” for all lines of its business in 
its annual statements to TDI for the first time in 1996. Having learned that 
Dallas Fire could apportion the unallocated loss adjustment expense to its 
various lines of business for reporting purposes, Milam decided that Dallas Fire 
could also charge those expenses against the contingent profit commissions for 
TCSCA and Young as “loss adjustment expense” under the formula for computing 
the contingent profit commissions.
        TCSCA 
had generated a total of approximately $3.4 million in earned premiums for 
Dallas Fire by 1997. It was undisputed that the bond business had been more 
profitable for Dallas Fire than any of its other lines of business. However, 
when Dallas Fire included unallocated loss adjustment expense in recalculating 
the contingent profit commissions for TCSCA and Young, not only would the agents 
be due no further contingent profit commissions, but Dallas Fire claimed they 
owed it reimbursement for all previous contingent profit commissions paid.
        By 
letter from Milam to TCSCA dated January 21, 1997, Dallas Fire informed TCSCA 
that Dallas Fire would include unallocated loss adjustment expense in the 
formula for calculating the contingent profit commissions, retroactively to the 
beginning of their agency agreement. Dallas Fire unilaterally withdrew the 
commissions previously deposited into escrow and made demand for reimbursement 
of the previously paid commissions to TCSCA and Young.
        E. 
This Suit Results
                1. 
Claims asserted
        TCSCA 
filed this suit on May 27, 1998, alleging breach of the Agency-Company Agreement 
and seeking a declaratory judgment that unallocated loss adjustment expense was 
not properly included in calculating the contingent profit commissions under the 
terms of the Agency Commission Schedule. Young intervened for breach of his 
separate agreement for contingent profit commissions. Dallas Fire counterclaimed 
on May 14, 1999, alleging overpayment of the previous commissions based on 
“unjust enrichment” as the result of Dallas Fire’s incorrect calculation 
of the commissions and asserting a separate claim against Fred Thetford for a 
personal loan. Subsequently, Dallas Fire added Thetford as a third-party 
defendant.
        After 
numerous pleading amendments by all parties, the case was tried to a jury on 
claims by TCSCA and Young: asserting breach of the Agency-Company Agreement and 
violations of article 21.21 of the Texas Insurance Code based upon 
misrepresentations by Dallas Fire in violation of section 17.46(b)(12) of the 
DTPA; and seeking a declaratory judgment. Additionally, the jury considered 
Dallas Fire’s counterclaims, whereby Dallas Fire asserted that, in addition to 
unjustly benefitting from overpayment of the commissions, TCSCA and Young 
breached the contract and committed torts including violations of the DTPA and 
article 21.21, fraud, and breaches of fiduciary duty in failing to furnish a 
letter of credit, failing to remit all premiums collected, and issuing bonds 
outside the State of Texas and on projects after work had begun.
                2. 
Commission dispute
        The 
main factual dispute at trial concerned how the contingent profit commission was 
to be calculated under the Agency Commission Schedule. Tom Young testified that, 
in the negotiations leading to the final agreement for the commission, the 
parties had discussed the sliding scale for calculation of the commission. Young 
testified that those discussions included what items would be included as 
“loss adjustment expense” as that term was used in the formula.
        Young 
testified that, on December 28, 1994, before signing the amended Agency 
Commission Schedule, he and Thetford inquired what the term “loss adjustment 
expense” meant in a meeting with Milam and Dahlbo at Dallas Fire’s offices. 
According to Young, Dahlbo explained in Milam’s presence that it would include 
only losses incurred that were directly attributable to “third party costs,” 
that is, expenses actually paid out that could be tied directly to a specific 
claim on a bond issued through TCSCA. Young testified that Milam did not respond 
differently.
        Young 
further testified that he and Thetford signed the Agency Commission Schedule in 
reliance upon Dahlbo’s explanation of what items would be included in “loss 
adjustment expense.” Thetford agreed with Young’s understanding of the way 
the contingent profit commissions would be computed. Thetford testified it was 
never the intent of the parties that the term would include expenses for 
internal handling of claims or overhead of the company’s business. He said he 
had never heard “unallocated loss adjustment expense” mentioned as being 
included until January 1997.
        The 
testimony of all witnesses was consistent that the manner in which Dallas Fire 
computed the contingent profit commissions in 1994 and 1995 did not include 
unallocated loss adjustment expense, but only the actual amounts paid out for 
third party adjustment and legal expense. Young and Thetford testified that they 
continued producing for Dallas Fire based upon the manner in which the 
contingent profit commissions were computed for the years 1994 and 1995, 
reflecting the agreement as they understood it, and that they could have moved 
their business at any time under the agreement and probably would have done so 
had they known Dallas Fire would later change the calculations of the 
commissions to include unallocated loss adjustment expense.
        Dahlbo 
testified at trial that he had recommended the concept of the contingent profit 
commission for TCSCA.[1]  It was not a new idea; 
it had been part of the Harris & Lightfoot agreement with Dallas Fire, he 
said, and this was reflected by that agency’s previous agreement. He 
recommended it, brought it up, and “authored” the formula for TCSCA and 
Young. He generally recalled that contingent profit commission would have been 
part of the initial discussions with the agents although he could not recall a 
specific discussion. However, to the best of his knowledge, there was never any 
intention to include unallocated loss adjustment expense at the time the 
agreements were entered into with TCSCA and Young.
        Dahlbo 
further testified that he personally calculated the contingent profit 
commissions for both 1994 and 1995, using only expenses paid to outside 
adjusters and legal expenses. His understanding was that nothing else was to be 
included. He prepared the calculations for both years from “loss runs” 
listing only losses paid and reserves for loss adjustment expense to be paid out 
and presented them to Milam for his approval. He also gave Milam copies of the 
computer printouts showing all the numbers that went into the calculations. 
Dahlbo testified Milam never mentioned unallocated loss adjustment expense as to 
the figures for 1994.
        In 
December 1995 or January 1996, Dahlbo recalled that Milam told him new auditors 
reviewing Dallas Fire’s records had raised the issue of reporting unallocated 
loss adjustment expense. Initially, Dahlbo agreed that issue had to do with how 
the company presented its books to the regulators. At some point, Milam asked 
him if that would impact TCSCA, and he told Milam that was an “issue he would 
have to take up with [the agents].” However, no one at Dallas Fire ever 
mentioned to Dahlbo that a “mistake” had been made in not including 
unallocated loss adjustment expense in the 1994 or 1995 commission calculations.
        Milam 
testified that he recalled the subject of the contingent profit commissions 
coming up in meetings with Young and Thetford before the first agreement was 
reached and had no recollection of the amended agreement. The exact date and 
what was said was “foggy.” He did not recall specific discussions of the 
term “loss adjustment.” His intent of the contract was for it to be 
“fair.”
        Milam 
denied knowing how the loss adjustment expense was calculated for the contingent 
profit commissions for 1994 and 1995; however, he acknowledged that he was first 
advised Dallas Fire could apportion unallocated loss adjustment expense to its 
various lines of business in its financial reports to TDI in January of 1996, by 
a consultant he had hired to help the company with its statutory filings. Milam 
further testified that the formula for apportioning unallocated loss adjustment 
expenses was first devised in 1996. Dallas Fire apportioned among all their 
lines of business the “unallocated” expenses, including salaries and 
benefits of adjusters, actuaries, and secretaries; telephones; equipment; 
postage; and support for accounting. They then went back and recalculated the 
contingent profit commissions for TCSCA and Young and included those expenses as 
related to the bond business for the two previous years.
        It 
was between December of 1995 and January of 1996 that Dallas Fire changed the 
way it calculated those commissions, Milam said. Milam explained that the 
company wanted to be in compliance with their auditors and the state regulators. 
He characterized the company’s lack of inclusion of unallocated loss 
adjustment expense in calculating TCSCA’s and Young’s contingent profit 
commissions for 1994 and 1995 as an “oversight.”
        Following 
an eight-day trial, the jury failed to find that Dallas Fire breached the 
Agency-Company Agreement. However, the jury found that Dallas Fire knowingly 
misrepresented the rights, remedies, or obligations of the parties regarding 
inclusion of “unallocated adjustment loss expenses” in the contingent profit 
commission calculations, which was a producing cause of damages of $52,641.02 to 
TCSCA and $82,641.02 to Young.
        The 
jury also found that TCSCA breached the Agency-Company Agreement and committed 
breaches of fiduciary duty but that no damages resulted to Dallas Fire and, 
further, that Dallas Fire discovered or should have discovered any breach of 
contract or breach of fiduciary duty on January 27, 1994, more than four years 
before the filing of its original counterclaim. Judgment was rendered on the 
jury’s verdict in favor of TCSCA, Young, and Thetford for their actual 
damages, attorney’s fees awarded by the jury, and prejudgment interest. A 
take-nothing judgment was rendered against Dallas Fire on its counterclaim and 
third party claim.
III. ARTICLE 21.21 CLAIM
        A. 
“Business of Insurance”
        By 
its first issue, Dallas Fire contends the trial court erred in overruling its 
motion for judgment notwithstanding the verdict (“JNOV”) on TCSCA’s and 
Young’s claims that Dallas Fire violated the DTPA as incorporated into article 
21.21 of the Texas Insurance Code.[2]  When their 
claims arose, section 16(a) of article 21.21 provided:
Any person who has sustained 
actual damages caused by another’s engaging in an act or practice declared in 
Section 4 of this Article to be unfair methods of competition or unfair or 
deceptive acts or practices in the business of insurance or in any practice 
specifically enumerated in a subdivision of Section 17.46(b) of the Business and 
Commerce Code, as an unlawful deceptive trade practice may maintain an action 
against the person or persons engaging in such acts or practices.[3]

        TCSCA 
and Young alleged Dallas Fire violated section 17.46(b)(12).[4]  
Tracking the wording of that statute, Jury Question No. 6 inquired as follows:
Did Dallas Fire engage in any 
unfair or deceptive act or practice that caused damages to Texas Contractors or 
Young?
 
“Unfair or deceptive act or 
practice” means the following:
(a)Representing that an 
agreement confers or involves rights, remedies or obligations which it does not 
have or involve.

The jury found in favor of 
both TCSCA and Young on that question and found, additionally, that Dallas Fire 
engaged in such conduct “knowingly.”
        The 
focal point of Dallas Fire’s appeal is its contention, presented as subissue 
(b) of its first issue, that it was entitled to a JNOV on TCSCA’s and 
Young’s article 21.21 claims because, as a matter of law, the parties’ 
dispute did not arise out of the “business of insurance” as that term is 
used in section 16(a) of article 21.21. In reviewing the denial of a motion for 
JNOV, we consider whether the evidence is conclusive or whether a legal 
principle applies to entitle the movant to judgment as a matter of law.[5]
        Dallas 
Fire argues that, because TCSCA and Young sold only contract surety bonds, they 
were engaged only in the “surety bond business,” not the “business of 
insurance,” and thus have no cause of action under article 21.21 as a matter 
of law. Dallas Fire relies on Great American Insurance Co. v. North Austin 
Municipal Utility District No. 1,[6] asserting 
that the supreme court ”held without equivocation that article 21.21 does not 
apply to the surety bond business.” We do not read Great American as 
broadly as Dallas Fire does, to exclude a dispute between insurance agents and 
an insurer regarding commissions from the “business of insurance” for 
purposes of article 21.21.
        The 
supreme court in Great American stated that the issues in that case 
involved “the duties and liabilities of a commercial surety to its bond 
obligee.”[7]  The suit concerned a claim on 
a performance bond issued by Great American as surety, to a general contractor 
on a construction project as principal, in favor of a municipal utility district 
as obligee.[8]  When work by a subcontractor was 
found to be defective, the contractor refused to correct the problem, contending 
the defect was the result of the utility district’s plans and specifications.[9]  The utility district demanded that Great American 
perform under its bond.[10]  Great American 
delayed for several months, requesting additional evidence and legal authority 
for the utility district’s claim, culminating in a suit by the utility 
district with a judgment on a jury verdict against Great American for breach of 
good faith and fair dealing, deceptive acts in violation of article 21.21, and 
breach of contract.[11]
        Reversing 
and rendering judgment in favor of Great American on both tort claims, the 
supreme court first held that no “special relationship” exists between a 
surety and its obligee, as distinguished from that between an insurer and its 
insured under a liability insurance policy, so as to give rise to a duty of good 
faith and fair dealing similar to that owed by insurers to policyholders as 
previously recognized by the supreme court.[12]  
The court then turned to Great American’s contention that the legislature did 
not intend that suretyship be included within the “business of insurance” 
regulated by article 21.21.[13]
        Noting 
the absence of a definition of “business of insurance” in article 21.21, the 
court nevertheless rejected the argument that other portions of the Insurance 
Code addressing sureties and surety bonds, such as article 1.14-1 entitled 
“Unauthorized Insurance” (specifically including the sale or issuance of 
surety and guaranty bonds in the list of acts defined therein as “insurance 
business”), were determinative of the intended scope of article 21.21 in that 
case.[14]  Instead, the court looked to the 
history and origin of suretyship, as well as characteristics distinguishing the 
relationship of insurer and insured from the tripartite relationship between 
surety, principal, and obligee.[15]  In addition 
to reiterating its previous differentiation between those relationships in 
rejecting a duty of good faith and fair dealing, the court noted that insurance 
involves pooling and spreading of risks with no right of indemnity by the 
insurer against the insured, whereas suretyship allows a full right of indemnity 
by the surety against the principal, which would be compromised by allowing 
extra-contractual damages to be recovered by the obligee against the surety.[16]
        As 
we read Great American, it was the “unique” rights, obligations, and 
characteristics of the “suretyship” relationship, as well as the 
complications that would result from applying article 21.21 to that 
relationship, that led the supreme court to decline to construe the term 
“business of insurance” as defined in the statute to include a claim by an 
obligee against the surety.[17]  Unlike Great 
American, this case does not involve a dispute between either an obligee or 
principal on a bond or Dallas Fire in its capacity as surety. Neither the 
circumstances out of which Great American arose nor the policies 
underlying the decision involving the specific relationship between surety and 
obligee are involved here.
        Dallas 
Fire articulates no argument supporting a legislative intent to exclude a 
dispute arising out of a relationship between an insurance company and its 
agents and involving commissions from the scope of article 21.21 merely because 
the product sold was surety bonds, nor does Dallas Fire offer any rationale for 
extending the holding of Great American to the relationship between a 
commercial surety and its agents arising out of an agency-company agreement. 
Dallas Fire points to no “unique” rights, obligations, or characteristics of 
the agency relationship between these parties distinguishing it from any other 
agency relationship between an insurer and its agents.[18]
        TCSCA 
relies on Crown Life Insurance Co. v. Casteel, which holds that an 
insurer’s agent has standing to sue the insurer for misrepresentations under 
section 17.46(b)(12) of the DTPA as incorporated into article 21.21 because the 
agent qualifies as a “person,” as defined in article 21.21, section 2(a), as 
“any individual, corporation, association, partnership, . . . and any other 
legal entity engaged in the business of insurance, including agents, 
brokers, adjusters, and life insurance counselors.”[19]  
While we agree with Dallas Fire that Casteel is not dispositive, it is 
instructive because, in construing the term “person” broadly, the court 
stated it was the legislature’s intent that article 21.21 be “liberally 
construed and applied to promote its underlying purposes,” and that a broad 
interpretation was “consistent with the Legislature’s express objective to 
regulate all insurance trade practices to conclude that an insurance 
agent is a ‘person’ with standing to sue an insurance company when the agent 
is damaged by company practices that violate Article 21.21.”[20]
        By 
its reply brief, Dallas Fire points out that the 77th Legislature 
added article 7.20 to the Insurance Code, effective September 1, 2001, to 
regulate commercial surety companies’ handling of claims by bond obligees on 
construction payment bonds involving public projects.[21]  
Dallas Fire relies upon the House Bill Analysis’s description of the amendment 
as being necessary in response to the supreme court’s holding in Great 
American and as “amend[ing] the Insurance Code to provide that the 
business of insurance includes the actions of a surety company.”[22]  
The bill analysis also points out that the amendment applies only to surety 
bonds issued or renewed on or after January 1, 2002.[23]
        Essentially, 
Dallas Fire argues that the legislation specifically included surety companies 
in the definition because they were not included before the legislation. We 
agree with TCSCA, however, that the amendment addresses only a commercial 
surety’s duties and liability to its bond obligee in payment of claims. Rather 
than supporting Dallas Fire’s position, we believe the plain language and 
narrow scope of the amendment in response to Great American further 
supports our interpretation that Great American is limited to disputes 
between a commercial surety and its bond obligee.
        We 
also reject Dallas Fire’s reliance upon Dagley v. Haag Engineering Co., 
which held that Haag Engineering Co., hired to investigate a hailstorm claim 
under a homeowner’s insurance policy, was not engaged in the “business of 
insurance” under article 21.21 because the case is factually distinguishable.[24]  The court held that the engineering services 
provided did not constitute the “business of insurance.”[25]
        Dallas 
Fire argues that TCSCA admitted at trial that its only connection with Dallas 
Fire arose out of the business of selling surety bonds and that there was no 
evidence that TCSCA sold insurance policies. We note that, in Insurance Co. 
of North America v. Morris, the supreme court held that investment brokers 
who sold surety bonds on behalf of an insurance company, in the course of 
marketing leveraged investments, were selling “insurance products” without 
being licensed by TDI, and that indemnity agreements under the bonds were thus 
void, where the brokers transmitted the bond applications and indemnity 
agreements and collected the bond premiums.[26]  
Thus, they were deemed to be agents of the company under article 21.02 of the 
Insurance Code, which provides:
 
Any person who solicits 
insurance on behalf of any insurance company . . . or who takes or transmits 
other than for himself any application for insurance or any policy of insurance 
. . . or do[es] or perform[s] any other act . . . in the making or consummati[on] 
of any contract of insurance . . . shall be held to be the agent of the company 
for which the act is done.[27]

        Morris 
informs us that surety bonds are “insurance products” for the purpose of 
article 21.02 relating to agent licensing requirements.[28]  
Additionally, there was evidence that the principal line of business of Dallas 
Fire is and always has been commercial general liability insurance. The 
testimony was undisputed that the Agency-Company Agreement between TCSCA and 
Dallas Fire was Dallas Fire’s standard form for its agency agreements with 
agents who would have been engaged in selling such insurance. Moreover, that 
agreement provided that “[i]t is agreed between the Company and Agent that . . 
. [t]he Agent is . . . authorized to: 1. solicit, receive, and transmit to the 
Company proposals for insurance contracts, including surety bonds, for 
which a premium is specified herein.”[29]
        Dallas 
Fire points to evidence that the term “insurance contracts” remained in the 
contract as a clerical error, but Dallas Fire acknowledges and the evidence 
shows that Young and Thetford were required to be licensed as insurance agents 
by TDI to sell surety bonds and that TCSCA was required to be appointed by 
Dallas Fire to serve as its agent by forms filed with TDI. The application for 
the agency appointment of TCSCA, signed by the vice president of Dallas Fire, 
stated: “Applicant meets the qualifications of the Texas Insurance Code and 
the rules and regulations of the Texas Department of Insurance for the type of 
license applied for.”
        Auditors 
from TDI routinely examined TCSCA’s books and records at its agency offices. 
Additionally, there was evidence that Dallas Fire maintained reserves for 
estimated losses and legal expenses for claims on surety bonds and for its other 
lines of business. Dallas Fire concedes that TDI is the regulatory agency for 
the surety bond business.[30]  Licenses to 
solicit and procure surety bonds are insurance agent licenses issued by TDI.[31]
        Defending 
his decision on behalf of Dallas Fire to charge unallocated loss adjustment 
expense against the agent commissions at issue here, Milam testified that he 
relied upon the “highly regulated” nature of insurance companies like Dallas 
Fire, that are subject to annual audits by TDI. Milam’s decision in 1996 to 
begin charging the unallocated loss adjustment expense against the agents’ 
commissions was because “we are governed by the Texas Department of 
Insurance.” Even though nothing in the Agency-Company Agreements specified 
that the agents’ commissions were to be governed by TDI’s reporting 
requirements, Milam said he wanted to be in compliance with those reporting 
requirements of the auditors and TDI regulators.
        When 
the new auditor in 1996 informed Milam that Dallas Fire could include 
unallocated loss adjustment expense in its annual reports, he acknowledged “a 
light went off in [his] head,” and he determined that those figures could also 
be included in calculating the agents’ commissions.
        In 
accord with the legislature’s expressed intent that article 21.21 be construed 
liberally to promote its underlying purposes and the reasons expressed by the 
supreme court for concluding that the unique surety/obligee relationship is not 
governed by that statute, we conclude that Great American’s holding 
that a dispute arising out of that relationship does not arise out of the 
“business of insurance” for purposes of article 21.21 does not extend to 
this case.[32]  We agree with Dallas Fire that 
the issue is one of law, but we hold that the dispute between TCSCA and Young as 
agents and Dallas Fire arose out of the “business of insurance” as a matter 
of law.[33]  We overrule Dallas Fire’s 
subissue (b) of its first issue.
B. Dispute as to Contract Terms
        Three 
of Dallas Fire’s other subissues under its first issue are related. Dallas 
Fire contends that TCSCA’s and Young’s tort claims for misrepresentions by 
Dallas Fire sounded only in contract, not in tort; that the claims involved 
merely a dispute over interpretation of an ambiguous contract term, i.e., 
“loss adjustment expense,” and therefore were not actionable under the DTPA 
as incorporated into article 21.21; and that, because the jury found Dallas Fire 
did not breach the Agency-Company Agreement, Dallas Fire was entitled to a JNOV 
as to the jury’s findings of DTPA and article 21.21 liability and damages. We 
will address these subissues (a), (c), and (d) together.
        Dallas 
Fire first argues that TCSCA’s and Young’s claims are merely for breach of 
contract because they claimed only that Dallas Fire violated the DTPA by 
“including” unallocated loss adjustment expense in the calculations for the 
contingent profit commissions. Dallas Fire also urges that TCSCA and Young 
sought and recovered only economic loss, which was the subject of the contract, 
i.e., the amount of commissions they claimed were due. Thus, Dallas Fire 
contends the DTPA claims sound only in contract and cannot be recast as 
tort-based claims under the DTPA and article 21.21.
        Dallas 
Fire principally relies upon Crawford v. Ace Sign, Inc.,[34] noting that, although the plaintiff in that case claimed 
that the defendant was involved in “more than mere nonperformance of the 
contract” by asserting he made several oral misrepresentations actionable 
under the DTPA, the supreme court nevertheless held that the case was governed 
only by contract law, not the DTPA. To hold otherwise, said the court, would 
“convert every breach of contract into a DTPA claim.”[35]  
Dallas Fire also cites Ashford Development, Inc. v. USLife Real Estate 
Services Corp., which holds that “[a]n allegation of a mere breach of 
contract, without more, does not constitute a ‘false, misleading or deceptive 
act’ in violation of the DTPA.”[36]
        TCSCA 
and Young contend that Dallas Fire has mischaracterized their claims because 
they did not merely complain of Dallas Fire’s conduct in “including” 
unallocated loss adjustment expense. Instead, they maintain that they pleaded 
and produced evidence that Dallas Fire made affirmative misrepresentations both 
by verbal statements and by conduct in computing their 1994 and 1995 commissions 
in accordance with those misrepresentations, which thereby induced TCSCA and 
Young both to enter into and to continue to produce under the agency agreement 
with Dallas Fire for two years.
        Reiterating 
our previous discussion of the evidence, Young testified that, prior to entering 
into the final agreement for the commissions: Dahlbo explained that third party 
expenses and legal expenses actually paid would be the only costs included as 
“loss expense,” as that term was used in the formula set forth in the Agency 
Commission Schedule; that Milam, Dallas Fire’s president, was present and did 
not disagree; and that TCSCA and Young relied upon the statements by Dahlbo in 
entering into the final agency agreement, as well as on the subsequent payment 
by Dallas Fire of the commissions for 1994 and 1995 in accordance with those 
statements, in continuing to do business under their contract with Dallas Fire.
        Further, 
Milam testified that not including unallocated loss adjustment expenses in 
computing the commissions for those first two years was an “oversight” and 
that the formula was “changed” to include the unallocated loss adjustment 
expense only in 1996. Milam contradicted himself by testifying that he told 
Young and Thetford when they signed the Agency Commission Schedule that “loss 
expense” included unallocated losses, but then testified that there 
“didn’t need to be a discussion,” because the agreement “speaks for 
itself”; it “means what it means,” even though unallocated loss adjustment 
expense was not mentioned in the agreement.
        Dallas 
Fire overlooks the foregoing evidence in the record of misrepresentations 
concerning the loss adjustment expenses to be included in calculating the 
commissions, which distinguishes this case from Crawford. In Crawford, 
the evidence established only that the defendants represented they would perform 
under the contract, their nonperformance was alleged as the 
“misrepresentation,” and there was no claim of inducement into the contract.[37]  Likewise, in Ashford, the court merely held 
that breach of contract does not constitute a false, misleading, or deceptive 
act under the DTPA.[38]  Those cases are not 
applicable here where there was evidence that Dallas Fire made affirmative 
statements constituting misrepresentations that induced TCSCA and Young into the 
agency contract.
        We 
are mindful of the guidelines established by the supreme court as urged by 
Dallas Fire, that to determine whether a claim sounds in tort or contract, we 
look to the source of the duty allegedly breached as well as the nature of the 
remedy sought.[39]  In DeLanney, the 
supreme court also recognized that, when a defendant’s conduct would give rise 
to liability independently of whether a contract exists between the 
parties, a plaintiff’s claim may sound in tort.[40]  
More recently, in Formosa Plastics Corp. v. Presidio Engineers and 
Contractors, Inc., the supreme court declined to apply DeLanney and Crawford 
to preclude a cause of action for fraudulent inducement into a contract.[41]  As the court in Formosa Plastics points 
out, Texas law has long recognized the duty, independent of duties under a 
contract, to refrain from inducing another into a contract by fraudulent 
misrepresentations, despite the fact that the aggrieved party’s damages may 
only be economic losses.[42]
        Formosa 
Plastics teaches that an independent duty is imposed on the general public 
to abstain from inducing others to enter into contracts by the use of fraudulent 
misrepresentations, irrespective of whether the misrepresentations are later 
subsumed into the contract or whether the damages suffered are only the economic 
loss related to the subject matter of the contract.[43]  
Dallas Fire argues that Formosa Plastics applies only to fraud and does 
not extend to DTPA misrepresentations. We disagree.
        While 
recovery under the DTPA is unavailable for simple breach of contract, that is 
not the case where the contract was obtained by misrepresentations. Numerous 
cases have applied the rule of Formosa Plastics in the context of DTPA 
claims as well as fraud.[44]  We reject Dallas 
Fire’s argument that TCSCA’s and Young’s claims under the DTPA sound only 
in contract. Their claims are not based on Dallas Fire’s failure to 
perform duties imposed by the contract but on the independent duty imposed by 
law not to make knowing misrepresentations inducing a party into a contract, 
irrespective of the fact that the damages claimed constitute only economic 
losses that were the subject matter of the contract.[45]
        Dallas 
Fire argues, however, that TCSCA’s and Young’s DTPA claims under article 
21.21 were based solely on the parties’ dispute over the interpretation of a 
contract term, i.e., the term “loss adjustment,” contained in the formula 
for computing the contingent profit commissions but not defined, which the trial 
court determined to be ambiguous. Dallas Fire maintains that Texas courts have 
consistently held that a controversy over a disputed contract term is not 
actionable as a misrepresentation under section 17.46(b)(12) of the DTPA relied 
upon by TCSCA and Young. Dallas Fire relies upon Quitta v. Fossati,[46] refusing to allow a dispute involving alternative 
interpretations of a term in a contract to be recharacterized as a claim under 
DTPA section 17.46(b)(12), and Group Hospital Services, Inc. v. One and Two 
Brookriver Center,[47]  holding that 
disagreements over the interpretation of a contract with uncertain terms were 
not actionable under that section.
        TCSCA 
and Young distinguish Quitta, pointing out that Quitta involved an 
asserted DTPA claim based only on failure to abide by an alleged oral 
modification of a lease.[48]  We agree with 
TCSCA’s and Young’s interpretation of Quitta, that the case involved 
“traditional contract notions” because the lessor merely sought performance 
of the lease, the lessees sought to prove the existence and nature of additional 
terms of the parties’ agreement, and there was no evidence of a false, 
misleading, or deceptive act under the DTPA.[49]
        The 
court in Quitta relied upon Group Hospital, which likewise 
involved a suit on a lease in which tenants merely asserted that their landlord 
falsely misrepresented its rights to charge for extra air conditioning and 
electricity, to orally modify the lease, and to bill through a single meter, as 
the landlord claimed in its suit.[50]  The court 
of appeals held the tenant’s claim boiled down to a “controversy over what 
the lease meant” and that the suit involved nothing more than a contract 
interpretation, rather than a DTPA violation.[51]  
Again, no verbal or written misrepresentations outside the terms of the contract 
were asserted.
        We 
acknowledge that both parties here asserted differing interpretations of the 
term “loss adjustment expense” as contained in the Agent Commission Schedule 
and that the term was not defined in the contract, but the allegations and 
evidence here involved more than a mere dispute over interpretation of a 
contract term. We are unpersuaded that Quitta and Group Hospital 
are dispositive of the DTPA claims asserted here. “[I]ndependently actionable 
conduct under the DTPA would fall outside the Quitta [and Group 
Hospital] holding[s].”[52]  Unlike the 
claimants in those cases, TCSCA and Young asserted affirmative, verbal 
misrepresentations outside the terms of the contract. The factual dispute 
concerned: whether Dallas Fire’s marketing director verbally misrepresented 
that the term “loss adjustment expense” would include only third party and 
legal expense paid for particular bond claims; whether TCSCA and Young were 
induced into the contract by that misrepresentation; and whether they were 
induced to continue performing under the contract by the company’s subsequent 
actions.
        The 
parties agree that conduct must involve more than differing interpretations to 
rise to the level of a misleading or deceptive act sufficient to invoke the 
DTPA.[53]  Whether a claim involves only a 
breach of contract is a “fact-driven” inquiry, but whether the facts, once 
ascertained, rise to the level of a DTPA violation is a question of law.[54]  Statements constituting an affirmative 
representation of existing fact, or even a promise of future performance with no 
present intent to perform, which induces the claimant to enter into the 
contract, may rise to the level of DTPA violations.[55]  
For example, in Parks v. DeWitt County Electric Co-op, Inc., the court of 
appeals held, in part, that verbal assurances by an electric co-operative that 
it would not remove any trees from the claimant’s land that induced them into 
a contract granting the co-operative a utility easement were actionable as 
misrepresentations under the DTPA, independent of the contract.[56]
        In 
its reply brief, Dallas Fire argues for the first time that, even assuming there 
is proper pleading and proof of misrepresentations that are actionable under the 
DTPA regarding what expenses would be included as “loss adjustment” expense 
in calculating the commissions, there is no evidence that TCSCA or Young relied 
on those alleged misrepresentations in entering into the Agency Commission 
Schedule or that they were a producing cause of the damages found by the jury. 
But Dallas Fire overlooks Young’s and Thetford’s testimony that they would 
probably not have entered into the agreement nor continued in the performance of 
the agency agreement for two years if they had known Dallas Fire would take a 
contrary position, and they would have moved their business elsewhere. Young and 
Thetford both testified to the amount of the damages claimed as the result of 
the alleged misrepresentations, totaling the same amounts awarded by the jury.
        We 
hold the trial court did not err in overruling Dallas Fire’s motion for JNOV 
because there was some evidence, more than a scintilla, that misrepresentations 
were made outside the contract that induced TCSCA and Young to enter into and to 
continue to perform the Agency-Company Agreement, and that their cause of action 
for misrepresentations properly sounded in tort under section 17.46(b)(12) of 
the DTPA, rising to more than a mere breach of contract claim involving 
interpretation of a disputed term.
        Finally, 
Dallas Fire contends that the jury’s failure to find that it breached the 
contract defeats TCSCA’s and Young’s DTPA claims under article 21.21 because 
the jury necessarily thereby accepted Dallas Fire’s interpretation of the term 
“loss adjustment expense” as permitting it to include unallocated loss 
adjustment expenses in calculating the contingent profit commissions. In this 
regard, Dallas Fire relies upon the supreme court’s holding in DeWitt 
County, that “a DTPA claim could not arise from actions permissible under 
a contract.”[57]  We disagree that the holding 
of the supreme court applies here. The supreme court rejected a claim by the 
landowner that the co-op’s “unreasonable interpretation” of the contract, 
that the contract permitted it to cut down trees on the landowner’s property, 
standing alone, constituted a misrepresentation under the DTPA.[58]  The court held that claim was not cognizable 
because the contract expressly permitted the co-op to cut down trees on the 
property covered by the easement.[59]
        TCSCA 
and Young did not claim that Dallas Fire merely asserted an “unreasonable 
interpretation” of the contract term “loss adjustment expense.” Rather, 
they alleged and offered proof of verbal statements made by Dallas Fire that the 
term as used in the agreement would not include expenses other than adjustment 
and legal expenses actually paid to third parties and tied directly to a bond 
claim. A similar claim was also made in DeWitt County, that the landlord 
made verbal assurances that it would not cut down the landowner’s trees 
within the easement.[60]  The supreme court did 
not address that claim, letting stand the holding of the court of appeals that 
the pleaded claim and evidence of the verbal assurances presented an issue for 
the jury as to misrepresentations actionable under section 17.46(b)(12) of the 
DTPA.[61]
        Dallas 
Fire argues that it cannot be subjected to extra-contractual liability based 
upon a contract that the jury found it did not breach, citing cases in which the 
supreme court has held that, in most instances, an insured may not prevail on a 
bad faith insurance claim against an insurer for denying a claim not covered by 
the policy.[62] The cases Dallas Fire cites, however, 
did not involve independent claims for misrepresentations under the DTPA. 
Moreover, this case does not involve the common law cause of action for breach 
of good faith and fair dealing in wrongfully denying a claim that was alleged to 
be covered under an insurance policy, as involved in the cases cited by Dallas 
Fire. An insurer ordinarily breaches its duty of good faith and fair dealing 
only by delaying or denying payment of a claim that is covered by the contract, 
after liability for the claim has become reasonably clear.[63]
        TCSCA 
and Young acknowledge that they could not have recovered for both breach of 
contract and violation of the DTPA under article 21.21 for the same damages but 
would have been required to elect their remedy if the jury had found damages in 
their favor on both of the theories of recovery.[64]  
We also note that, by finding no breach of the agreement, the jury could 
reasonably have concluded that the formula set forth in the Agency Commission 
Schedule permitted Dallas Fire to calculate the commissions to include 
unallocated loss adjustment expense but that, by doing so, Dallas Fire acted 
contrary to the representations to TCSCA and Young that it would not do 
so but would include only expenses actually paid to third party adjusters and 
legal expenses. Therefore, we do not see how the jury’s finding that Dallas 
Fire did not breach the contract necessarily precludes recovery on TCSCA’s and 
Young’s DTPA and article 21.21 claims for misrepresentation. Accordingly, we 
overrule subissues (a), (c), and (d) of Dallas Fire’s first issue.
C. Statute of Limitations for Article 21.21 Claim
        In 
subissue (e) of its first issue, Dallas Fire argues that it was entitled to a 
JNOV because TCSCA’s and Young’s claims under article 21.21 were barred by 
the two-year statute of limitations contained in section 16(d) of article 21.21.[65]  Dallas Fire points out that any alleged unfair or 
deceptive act would have occurred in late 1996 or early 1997 and that the 
evidence at trial established that January 21, 1997, the date of the letter from 
Dallas Fire informing the agents that unallocated loss adjustment expense would 
be included in the calculation of their commissions, would have been the date 
they discovered the occurrence of any such alleged unfair act.
        Milam 
acknowledged that, to his knowledge, the letter of January 21, 1997 was the 
first notice to TCSCA of Dallas Fire’s position regarding the commissions. 
According to Dallas Fire, TCSCA and Young then had until January 21, 1999 to 
file an article 21.21 action. Because they did not amend their pleadings to 
allege that claim until March 24, 2000, more than two years later, Dallas Fire 
contends their claims are barred by limitations.
        TCSCA 
and Young respond that Dallas Fire had the burden to request and obtain findings 
on limitations as a defense or to object to the absence of a jury question on 
that defense and by not doing so waived the defense of limitations. Dallas Fire 
maintains that the burden was on TCSCA and Young, as the parties seeking to 
avoid limitations, to prove and secure findings as to the date of discovery to 
avoid the defense. [66] We do not need to reach 
that issue because we agree with TCSCA’s and Young’s further argument that 
their amended pleading sought an additional ground for liability arising out of 
the same transaction and related back to their original pleadings that were 
filed timely, based on the relation-back statute, section 16.068 of the Texas 
Civil Practice and Remedies Code. [67]
        TCSCA 
filed its original petition for breach of contract on May 27, 1998, well within 
four years of the date of the alleged contract breach—whether in 1996 or 1997. 
The new cause of action under article 21.21, added by their amended pleadings in 
2000, arose out of the same conduct and asserted the same damages. TCSCA argues 
that the amended pleadings adding the article 21.21 claim relate back to its 
original pleading. Young similarly argues that his original plea in intervention 
asserting breach of contract was filed timely within four years on August 28, 
1999. Therefore, his amended pleadings adding the article 21.21 claim related 
back to the date of his original plea in intervention and were not subject to a 
plea of limitations. We agree. [68]
        We 
hold that the original pleadings of both TCSCA and Young were filed within the 
period of limitations for actions for breach of contract, and the amended 
pleadings alleging violations of article 21.21 were based upon the same 
transaction and occurrence and thus related back for limitations purposes to the 
filing of the original pleadings and were not barred by limitations as a matter 
of law. We overrule subissue (e) of Dallas Fire’s first issue.
IV. DALLAS FIRE’S COUNTERCLAIMS
        By 
its original counterclaim filed May 14, 1999, Dallas Fire alleged overpayment of 
commissions by virtue of “incorrect calculations,” seeking recovery of 
amounts previously paid to TCSCA under the contract. Dallas Fire did not add its 
claims for breach of fiduciary duty, among other tort claims against TCSCA, 
until filing its Fourth Amended Original Counterclaim on November 11, 2000. 
Specifically, Dallas Fire alleged breaches of fiduciary duty by TCSCA by (1) 
failure to provide a $75,000 letter of credit; (2) failure to pay premiums 
collected for bid bonds; and (3) issuance of bonds outside the State of Texas 
and after work on projects had commenced. Dallas Fire also sought a declaratory 
judgment as to the correct interpretation of the Agency-Company Agreement, as 
well as damages and “fee forfeiture” for the breach of fiduciary duty claim. 
In response to pleadings of limitations by TCSCA, Dallas Fire pleaded the 
discovery rule and application of the relation-back statute found in section 
16.068 of the civil practice and remedies code. [69]
        The 
jury found that TCSCA failed to comply with the Agency-Company Agreement but 
that its failure was excused. The jury also found that Dallas Fire discovered or 
should have discovered any breach of contract by TCSCA by January 27, 1994. 
Consequently, the jury did not reach or answer questions as to damages for 
breach of contract by TCSCA.
        The 
jury determined that TCSCA failed to comply with its fiduciary duty, but it did 
not find that any such failure was a proximate cause of any damages to Dallas 
Fire. Also, the jury found “0” in response to the general damages question 
regarding Dallas Fire’s causes of action. The jury further found that Dallas 
Fire discovered or should have discovered through the exercise of care and 
diligence TCSCA’s failure to comply with its fiduciary duty by January 27, 
1994.
        In 
addition to its motion for JNOV, Dallas Fire filed other post-trial motions, 
including a motion for partial new trial raising factual insufficiency issues 
and a motion for “equitable relief” seeking forfeiture of all “contingent 
fees [sic]” previously paid to TCSCA. Dallas Fire complains about the jury’s 
findings of the date of discovery and no damages on its breach of fiduciary duty 
claim and further complains of the trial court’s denial of its request for 
forfeiture of payments previously paid to TCSCA and denial of its attorney’s 
fees under the Declaratory Judgment Act.
A. Breach of Fiduciary Duty as to Bid Bond Premiums
        Dallas 
Fire contends in its third issue that there is legally and factually 
insufficient evidence to support the jury’s finding that it discovered or 
should have discovered TCSCA’s breaches of fiduciary duty by January 27, 1994. 
First, Dallas Fire relies upon testimony of Milam that he was unaware that TCSCA 
was not remitting bid bond premiums until late 1996 or early 1997 when a bond 
audit was conducted.
        Dallas 
Fire acknowledges that there is evidence in the record regarding the date of 
January 27, 1994, found by the jury to have been the date by which Dallas Fire 
discovered or should have discovered any breach of fiduciary duty as to the bid 
bonds. By a letter of that date, TCSCA employee Tanya Grant, wrote Dallas Fire 
and forwarded copies of all Dallas Fire bonds issued and charges, made for those 
bonds by TCSCA between August 1, 1993 and November 30, 1993, including bid bonds 
for which premiums were not remitted to Dallas Fire. Even Milam testified that 
he assumed that the company had information that TCSCA was issuing the bid bonds 
by January or February of 1994.
        Fred 
Thetford also testified that TCSCA opened its records, including figures for bid 
bonds sold, for a regular audit by TDI in 1994. We cannot say that there is 
legally or factually insufficient evidence in the record to support the jury’s 
finding that Dallas Fire discovered or should have discovered that TCSCA was 
charging bid bond fees and not remitting Dallas Fire’s portion to it by 
January 27, 1994.
        Alternatively, 
Dallas Fire argues that, while it may have been made aware of bid bond charges 
in 1994, the breaches continued to occur after that date when TCSCA continued to 
collect bid bond fees until 1996 and that they continued even through trial by 
TCSCA’s continued refusal to return commissions previously overpaid to it. 
However, as TCSCA points out, Dallas Fire never pleaded or obtained jury 
findings of a continuing tort or continuing injury as a basis to avoid 
limitations. [70]
        Finally, 
Dallas Fire argues that the relation-back statute applies. Dallas Fire argues 
that its claims for breach of fiduciary duty, first pleaded in November of 2000, 
arose out of the same transaction as the overpayment to TCSCA in breach of the 
contract as alleged in its original counterclaim filed May 14, 1999. Dallas Fire 
argues that the original counterclaim was timely filed within the four-year 
statute of limitations for breach of contract claims because the company did not 
determine that an overpayment of commissions had occurred until January of 1997. [71] Dallas Fire therefore contends that its subsequently 
pleaded fiduciary duty claims relate back to the filing of the original 
counterclaim and are likewise timely filed.
        We 
disagree with Dallas Fire’s relation-back argument for the reason that the 
jury expressly found, in answer to a separate question, that Dallas Fire also 
discovered or should have discovered any breach of contract by TCSCA by 
January 27, 1994. Dallas Fire has not challenged the jury’s finding in answer 
to that question. Based on that finding, Dallas Fire’s breach of contract 
claim was already barred by limitations when its original counterclaim was 
filed, more than five and one-half years later, on May 14, 1999. Under those 
circumstances, the relation-back doctrine does not apply. [72]
B. Projects outside State and Already in Progress
        By 
its third issue, Dallas Fire also complains of legally and factually 
insufficient evidence to support the jury’s finding that it discovered or 
should have discovered by January 27, 1994 any breach of fiduciary duty by TCSCA 
in writing performance bonds on construction projects outside the State of Texas 
or on projects already in progress. Dallas Fire relies on Milam’s testimony 
that it was during the same time frame that he first learned that TCSCA issued 
surety bonds outside the State of Texas, in New Mexico, Kansas, and Colorado, 
and on projects already in progress.
        TCSCA 
points us to no evidence contradicting Milam’s testimony that he did not 
discover that TCSCA had written performance bonds on construction projects 
located outside the State of Texas or on projects already in progress until late 
1996 or early 1997 at the time of the bond audit. However, any implicit jury 
finding that Dallas Fire discovered or should have discovered any such breach of 
fiduciary duty in those respects by January 27, 1994 is immaterial unless the 
jury’s failure to find that any such breach was a proximate cause of damage to 
Dallas Fire, and the jury’s further finding that Dallas Fire suffered “0” 
amount of damages as the result of any such conduct, are against the 
overwhelming weight and preponderance of the evidence. [73] 
In this court, Dallas Fire has not complained that the jury’s failure to find 
that any breach of fiduciary duty by TCSCA was a proximate cause of any damage 
to Dallas Fire was against the overwhelming weight of the evidence. On this 
basis alone, we hold that the jury’s finding of the date of discovery 
regarding the out-of-state bonds and bonds issued on projects in progress is 
immaterial. [74] We overrule Dallas Fire’s 
third issue.
        C. Claimed Damages for Breach of Fiduciary Duty
        In 
its fifth issue, Dallas Fire complains that the jury’s finding in answering 
Question No. 28 of “0” damages for TCSCA’s breach of fiduciary duty is 
against the overwhelming weight of the evidence. Dallas Fire points out that 
Milam testified he incurred damages of $27,000 for attorney George McCarthy to 
perform a bond audit, in the course of which the out-of-state bonds and bonds 
written on projects already in progress were discovered. [75] 
The other dollar amounts mentioned by Dallas Fire in its brief as evidence of 
damages are: (1) the contingent profit commissions of $69,890.33 previously 
paid, which it contends TCSCA failed to return; and (2) its percentage of the 
bid bond premiums claimed. Dallas Fire has not challenged the jury’s failure 
to find that any breach of fiduciary duty was a proximate cause of 
damages to Dallas Fire, in response to Question No. 18. [76] 
The law is well-settled that a finding of no damages is immaterial in the 
absence of a finding of proximate cause. [77] 
Accordingly, we overrule Dallas Fire’s fifth issue.
        D. Request for Equitable “Fee Forfeiture”
        By 
its fourth issue, Dallas Fire contends that, regardless of the jury’s findings 
on damages, the trial court abused its discretion by denying Dallas Fire’s 
motion for equitable relief seeking forfeiture of all commissions previously 
paid to TCSCA and Young, based on the jury’s finding of breach of fiduciary 
duty, as a matter of law. Dallas Fire argues that, when a fiduciary has 
benefitted or profited from a breach of fiduciary duty, the complainant is 
entitled to equitable relief in the form of disgorgement or fee forfeiture, 
without having to establish that the breach caused damage.
        We 
disagree that Dallas Fire would have established a right to equitable relief as 
a matter of law. To the contrary, the supreme court has held that whether to 
order fee forfeiture and to what extent, are matters within the trial court’s 
discretion. [78] Dallas Fire did not request 
that the trial court submit any of the questions necessary to apply the factors 
identified by the supreme court in order for a trial court to determine whether 
a “clear and serious violation of duty” has occurred, whether forfeiture is 
appropriate, and if so, whether all or only part of a fee should be forfeited, 
as set forth in Burrow, [79] upon which 
Dallas Fire relies.
        Because 
Dallas Fire did not request or obtain jury findings on whether TCSCA and Young 
acted intentionally, with gross negligence, or recklessly, or on the value of 
the agents’ services, as required by Burrow, we hold that the trial 
court acted within its discretion in denying the motion for equitable relief. [80] We overrule Dallas Fire’s fourth issue.
E. Attorney’s Fees under the Declaratory Judgment 
Act
        In 
its final issue, Dallas Fire contends the trial court abused its discretion in 
denying its request for attorney’s fees under the Texas Declaratory Judgment 
Act because the jury found that TCSCA breached the Agency-Company Agreement but 
Dallas Fire did not. Specifically, Dallas Fire argues that, by its findings, the 
jury necessarily determined that Dallas Fire did not breach the contract by 
including “unallocated loss adjustment expense” in the formula used to 
calculate TCSCA’s and Young’s contingent profit commissions, and thereby 
determined that the contract should be interpreted in Dallas Fire’s favor. 
Because both parties sought a declaratory judgment on that question of 
interpretation, Dallas Fire urges that it prevailed on that issue and that the 
trial court should have awarded it the attorney’s fees expended by it in 
defending against all of TCSCA’s and Young’s claims and in prosecuting its 
own counterclaims pertaining to interpretation of the agreement.
        Under 
the Declaratory Judgment Act, attorney fee awards are entrusted to the trial 
court’s sound discretion, “subject to the requirements that any fees awarded 
be reasonable and necessary, which are matters of fact, and to the additional 
requirements that fees be equitable and just, which are matters of law.” [81] We review a trial court’s ruling for an abuse of 
discretion. [82] Thus, we must determine whether 
the trial court acted arbitrarily, unreasonably, or without reference to any 
guiding rules or principles. [83] An abuse of 
discretion does not occur where the trial court bases its decisions on 
conflicting evidence. [84] Furthermore, an abuse 
of discretion does not occur as long as some evidence of substantive and 
probative character exists to support the trial court’s decision. [85]
        “Whether 
a party prevails in a declaratory judgment action is not a determining factor in 
awarding attorney’s fees.” [86] On this 
record, Dallas Fire has not shown that the trial court abused its discretion in 
denying its request for attorney’s fees under the Texas Declaratory Judgment 
Act. Accordingly, we overrule Dallas Fire’s sixth issue.
V. CONCLUSION
        Having 
overruled each of Dallas Fire’s six issues, we affirm the judgment of the 
trial court.
  
  
                                                          ANNE 
GARDNER
                                                          JUSTICE
  
  
PANEL B:   CAYCE, 
C.J.; GARDNER and WALKER, JJ.

DELIVERED: January 22, 2004 
 

 
NOTES
1. 
In May 1996, Dahlbo resigned as Marketing Director at Dallas Fire to work as an 
agent at TCSCA, but was asked to leave the agency after four months because 
Young and Thetford claimed he was not devoting enough time to business. Dahlbo 
acknowledged they had a “disagreement,” but he said he harbored no ill will 
toward Young and Thetford. Thus, by the time of trial, Dahlbo did not work for 
any of the parties.
2. 
Tex. Ins. Code Ann. art. 21.21 
(Vernon 2004).
3. 
See id. § 16(a).
4. 
Tex. Bus. & Com. Code Ann. § 
17.46(b)(12) (Vernon Supp. 2004).
5. 
See Wal-Mart Stores, Inc. v. Miller, 102 S.W.3d 706, 709 (Tex. 2003); Mancorp, 
Inc. v. Culpepper, 802 S.W.2d 226, 227-28 (Tex. 1990).
6. 
908 S.W.3d 415 (Tex. 1995).
7. 
Id. at 416 (emphasis added).
8. 
Id. at 416-17.
9. 
Id. at 417.
10. 
Id.
11. 
Id. at 417-18.
12. 
Id. at 418 (citing Aranda v. Ins. Co. of N. Am., 748 S.W.2d 210, 
212-13 (Tex. 1988) and Arnold v. Nat’l County Mut. Fire Ins. Co., 725 
S.W.2d 165, 167 (Tex. 1987)).
13. 
Id. at 420.
14. 
Id. at 422-24.
15. 
Id.
16. 
Id.
17. 
Id. at 424.
18. 
See id.
19. 
22 S.W.3d 378, 383-84 (Tex. 2000) (quoting Tex. Ins. Code Ann. art. 21.21, § 
2(a)).
20. 
Id. at 384 (quoting Tex. Ins. Code 
Ann. art. 21.21, § 2(a)).
21. 
Tex. Ins. Code Ann. art. 7.20.
22. 
Office of House Bill Analysis, 
H.B. 548, 77th Leg., R.S. (2001).
23. 
Id.
24. 
18 S.W.3d 787, 793 (Tex. App.—Houston [14th Dist.] 2000, no pet.).
25. 
Id. The case of Attorney General of Texas v. Allstate Insurance Co., 
687 S.W.2d 803 (Tex. App.—Dallas 1985, writ ref’d n.r.e.), also relied upon 
by Dallas Fire, is likewise not helpful. The Dallas court addressed the 
definition of “business of insurance” for the limited purposes of federal 
antitrust law under the McCarran-Ferguson Act, not article 21.21 of the 
Insurance Code. Id. at 806.
26. 
981 S.W.2d 667, 671-72 (Tex. 1998).
27. 
Tex. Ins. Code Ann. art 21.02; Morris, 
981 S.W.2d at 672.
28. 
981 S.W.2d at 671-72.
29. 
[Emphasis added.]
30. 
See Tex. Ins. Code Ann. art. 
21.14, §§ 2, 4, 5 (Vernon 1981 & Supp. 2004).
31. 
See id. § 4.
32. 
See 908 S.W.3d at 424.
33. 
While maintaining that the issue is one of law, Dallas Fire requested and the 
trial court submitted a jury question asking whether the dispute between TCSCA 
and Dallas Fire arose out of the “business of insurance.” Dallas Fire 
alternatively asserts in its second issue that there is legally or factually 
insufficient evidence to support the jury’s finding of “yes” to that 
question. Having held that the issue is one of law, we need not address Dallas 
Fire’s second issue. See Tex. R. 
App. P. 47.1.
34. 
917 S.W.2d 12, 13 (Tex. 1996).
35. 
Id. at 14.
36. 
661 S.W.2d 933, 935 (Tex. 1983).
37. 
917 S.W.2d at 13-14.
38. 
661 S.W.2d at 935.
39. 
See Crawford, 917 S.W.2d at 13-14 (holding action governed by contract, 
not DTPA, where failure to fulfill contract duty to publish advertisement, not 
misrepresentations, caused loss of profits); S.W. Bell Tel. Co. v. DeLanney, 
809 S.W.2d 493, 494-95 (Tex. 1991) (looking to both source of duty and nature of 
remedy sought, holding action sounded only in contract where duty arose from 
contract and only damages resulting was economic loss from failure to perform); Jim 
Walter Homes, Inc. v. Reed, 711 S.W.2d 617, 618 (Tex. 1986) (holding action 
sounded in contract, not negligence, where only damages were loss to subject 
matter of contract itself).
40. 
809 S.W.2d at 494.
41. 
960 S.W.2d 41, 46 (Tex. 1998).
42. 
Id. at 46-47.
43. 
See id.
44. 
See, e.g., Ken Petroleum Corp. v. Questor Drilling Corp., 24 S.W.3d 344, 
357 (Tex. 2000) (citing Best v. Ryan Auto Group, Inc., 786 S.W.2d 670, 
671-72 (Tex. 1990) (holding evidence of misrepresentations outside of contract 
legally sufficient to support claim for violation of DTPA section 
17.46(b)(12))); Clary Corp. v. Smith, 949 S.W.2d 452, 463-64 (Tex. 
App.—Fort Worth 1997, pet. denied) (holding duty to refrain from making 
misrepresentations imposed by law, not contract, supporting DTPA claim); Bekins 
Moving & Storage Co. v. Williams, 947 S.W.2d 568, 577-78 (Tex. 
App.—Texarkana 1997, no writ) (upholding DTPA claim for misrepresentations 
regarding additional details of performance inducing plaintiff to accept 
contract to move her furniture); Kuehnhoefer v. Welch, 893 S.W.2d 689, 
693 (Tex. App.—Texarkana 1995, writ denied) (upholding DTPA liability based 
upon misrepresentations to tenants concerning promise of renewal of existing 
lease with no intent to perform); see also Harris v. Chang, No. 
01-99-00728-CV, 2002 WL 24581, at *3 (Tex. App.—Houston [1st Dist.] 
2002, pet. denied) (not designated for publication) (holding evidence of 
misrepresentation regarding value of inventory and equipment included in sale of 
flower shop sufficient to support DTPA claim); Luera v. Maynes, No. 
07-99-00325-CV, 2000 WL 1051895, at *3 (Tex. App.—Amarillo 2000, pet. denied) 
(not designated for publication) (holding agreement to repair truck made with no 
intent to perform stated DTPA claim).
45. 
We are not holding that we would extend this rule to a misrepresentation not 
found to have been made knowingly under the DTPA. See D.S.A., Inc. v. 
Hillsboro I.S.D., 973 S.W.2d 662, 663 (Tex. 1998) (refusing to extend to 
negligent misrepresentation cases Formosa Plastic’s exception to the 
independent injury requirement in fraudulent inducement cases).
46. 
808 S.W.2d 636, 644 (Tex. App.—Corpus Christi 1991, writ denied).
47. 
704 S.W.2d 886, 888-89 (Tex. App.—Dallas 1986, no writ).
48. 
808 S.W.2d at 639-40.
49. 
Id. at 644.
50. 
Id. at 644-45 (citing Group Hosp. Servs., 704 S.W.2d at 889).
51. 
Group Hosp. Servs., 704 S.W.2d at 888-89.
52. 
Munawar v. Cadle Co., 2 S.W.3d 12, 19 (Tex. App.—Corpus Christi 1999, 
pet. denied) (citing Quitta, 808 S.W.2d at 644 n.4).
53. 
See Crawford, 917 S.W.2d at 13-14; Ashford, 661 S.W.2d at 935.
54. 
Chilton Ins. Co. v. Pate & Pate Enters., 930 S.W.2d 877, 890 (Tex. 
App.—San Antonio 1996, writ denied) (citing La Sara Grain Co. v. First 
Nat’l Bank of Mercedes, 673 S.W.2d 558, 565-66 (Tex. 1984)).
55. 
Ken Petroleum Corp., 24 S.W.3d at 357; Formosa Plastics, 960 
S.W.2d at 46-47; Best, 786 S.W.2d at 671-72; Clary Corp., 949 
S.W.2d at 463-64; Bekins Moving & Storage Co., 947 S.W.2d at 577-78; Kuehnhoefer, 
893 S.W.2d at 693; see also Chang, 2002 WL 24581, at *3; Luera, 
2000 WL 1051895, at *3.
56. 
962 S.W.2d 707, 711-12 (Tex. App.—Corpus Christi 1998), rev’d in part on 
other grounds, 1 S.W.3d 96 (Tex. 1999); see also Best, 786 S.W.2d at 
671-72 (holding evidence that defendant seller made false verbal assurances to 
purchaser of dealership that purchaser would be able to purchase additional 
inventory from manufacturer supported DTPA recovery under section 17.46(b)(12)); 
Leal v. Furniture Barn, Inc., 571 S.W.2d 864, 865 (Tex. 1978) (holding 
letter from furniture store stating that all funds previously deposited under 
layaway agreement would be forfeited if payment was not timely received 
constituted misrepresentation of rights of parties under agreement in violation 
of DTPA section 17.46(b)(12); Kuehnhoefer, 893 S.W.2d at 693 (holding 
trial court erred in granting JNOV on DTPA claim based on misrepresentation by 
landlord that lessee could renew existing lease for five years).
57. 
1 S.W.3d at 103.
58. 
Id.
59. 
Id.
60. 
Id. at 104.
61. 
Id. at 104-05.
62. 
Dallas Fire cites Liberty National Fire Insurance Co. v. Akin, 927 S.W.2d 
627, 629 (Tex. 1996), and Republic Insurance Co. v. Stoker, 903 S.W.2d 
338, 341 (Tex. 1995), for that proposition. But see Southstar Corp. v. St. 
Paul Surplus Lines Ins. Co., 42 S.W.3d 187, 194 (Tex. App.—Corpus Christi 
2001, no pet.) (distinguishing the insureds’ negligence and DTPA claims, 
linked to the duty to defend, as constituting only breach of contract claims, 
from their claims based upon alleged prior misrepresentations by St. Paul of the 
terms of the policy, holding that the misrepresentation claims could be 
brought independently of the claims for breach of the duty to defend under 
the insurance agreement).
63. 
See Universe Life Ins. Co. v. Giles, 950 S.W.2d 48, 56 (Tex. 1997); Stoker, 903 S.W.2d at 340.
64. 
See Waite Hill Servs., Inc. v. World Class Metal Works, Inc., 959 S.W.2d 
182, 184-85 (Tex. 1998).
65. 
See Tex. Ins. Code Ann. art. 
21.21, § 16(d) (stating that an action under article 21.21 must be commenced 
within two years “after the date on which the . . . unfair or deceptive act or 
practice occurred or within two years after the person bringing the action 
discovered or, in the exercise of reasonable diligence, should have discovered 
the occurrence of the unfair . . . act or practice.”).
66. 
See Woods v. William M. Mercer, Inc., 769 S.W.2d 515, 518 (Tex. 1988) 
(holding initial burden is on party seeking to establish limitation but party 
seeking to benefit from discovery rule has burden to plead, prove, and obtain 
favorable findings on issue of discovery as matter in avoidance).
67. 
Section 16.068 provides:
 
If 
a filed pleading relates to a cause of action, cross action, counterclaim, or 
defense that is not subject to a plea of limitations when the pleading is filed, 
a subsequent amendment or supplement to the pleading that changes the facts or 
grounds of liability or defense is not subject to a plea of limitation unless 
the amendment or supplement is wholly based on a new, distinct, or different 
transaction or occurrence.
Tex. Civ. Prac. & Rem. Code Ann. § 
16.068 (Vernon 1997).
68. 
See, e.g., Duran v. Furr’s Supermarkets, Inc., 921 S.W.2d 778, 791-92 
(Tex. App.—El Paso 1996, writ denied); Dorney v. Henderson Clay Prods., 
Inc., 838 S.W.2d 314, 316 (Tex. App.—Texarkana 1992, writ denied) 
(“Section 16.068 allows a cause of action to be pleaded in an amended pleading 
after a limitations period has run if the claim relates to a cause of action 
filed before the limitations period ran.”); Long v. State Farm Fire & 
Cas. Co., 828 S.W.2d 125, 128-29 (Tex. App.— Houston [1st 
Dist.] 1992, writ denied) (holding claim for breach of good faith and fair 
dealing that insurer failed and refused to pay in accordance with policy 
contract based on same transaction or occurrence as original breach of contract 
claim and thus related back for limitations purposes), disapproved of on 
other grounds by Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc., 
962 S.W.2d 507, 518-19 (Tex. 1998).
69. 
Tex. Civ. Prac. & Rem. Code Ann. § 
16.068.
70. 
See Dickson Constr., Inc. v. Fid. & Dep. Co. of Maryland, 960 
S.W.2d 845, 850 (Tex. App.—Texarkana 1997, no pet.) (holding matter in 
avoidance of limitations must be affirmatively pleaded); Arquette v. Hancock, 
656 S.W.2d 627, 629-30 (Tex. App.—San Antonio 1983, writ ref’d n.r.e.) 
(holding pleading alleging county constable wrongfully threatened and 
intimidated plaintiff into paying fine alleged a cause of action accruing when 
fine paid, not a continuing tort based on alleged continual failure to refund 
the money); Bank of N. Am. v. Kruger, 551 S.W.2d 63, 67 (Tex. Civ. 
App.—Houston [1st Dist.] 1977, writ ref’d n.r.e.) (holding action 
for conversion accrues when property actually taken, not continuing so as to 
toll limitations by failure to return); Foreman v. Graham, 363 S.W.2d 
371, 372-73 (Tex. Civ. App.—Beaumont 1962, no writ) (holding action for debt 
accrues when payment is due and is not extended by refusal to repay); see 
also Mitchell Energy Corp. v. Bartlett, 958 S.W.2d 430, 443 (Tex. 
App.—Fort Worth 1997, pet. denied) (noting plaintiffs obtained finding that 
injury to property was “ongoing and continuous” but holding theory not 
applicable to cause of action alleged for permanent injury to land).
71. 
Tex. Civ. Prac. & Rem. Code Ann. 
§ 16.004 (Vernon 2002).
72. 
See id. § 16.068; Cram 
Roofing Co. v. Parker, No. 04-01-00723-CV, 2003 WL 22955967, at *2 (Tex. 
App.—San Antonio Dec. 17, 2003, no pet.) (op. on reh’g en banc) (recognizing 
that for an amended pleading to relate back to an earlier pleading, “the 
original cause of action asserted in the first pleading must have been timely 
filed”).
73. 
Dallas Fire had the burden of proof both as to proximate cause and as to the 
amount, if any, of damages that would compensate it for any breaches of 
fiduciary duty of TCSCA; therefore, Dallas Fire has the burden on appeal to 
establish that the jury’s findings are so against the overwhelming weight and 
preponderance of the evidence as to be manifestly unjust. See Gooch v. Am. 
Sling Co., 902 S.W.2d 181, 184 (Tex. App.—Fort Worth 1995, no writ).
74. 
Wilson v. Tex. Parks & Wildlife Dep’t, 853 S.W.2d 825, 832 (Tex. 
App.—Austin 1993) (stating that unchallenged finding that appellant’s own 
negligence was the proximate cause of their deaths supported the trial court’s 
judgment and precluded reversal), rev’d on other grounds, 886 S.W.2d 
259 (Tex. 1994).
75. 
The jury was not asked to find damages for these bonds. Question No. 28 limited 
the elements of damages to (1) the amount charged for bid bonds and (2) 
overpayment of contingency fee commission. Dallas Fire does not challenge the 
manner of submitting the elements of damages. Thus, we only evaluate Dallas 
Fire’s fifth issue with respect to the two elements of damages that were 
submitted to the jury.
76. 
See McGalliard v. Kuhlmann, 722 S.W.2d 694, 696 (Tex. 1986) (stating that 
unchallenged findings of fact are binding unless the contrary is established as 
a matter of law or there is no evidence to support the finding).
77. 
Owens v. Rogers, 446 S.W.2d 865, 866 (Tex. 1969); Jones v. Lurie, 
32 S.W.3d 737, 744 (Tex. App.—Houston [14th Dist.] 2000, no pet.) 
(recognizing “the well-established rule of law that a finding of zero damages 
is immaterial in the absence of liability findings”); Wilson, 853 
S.W.2d at 832.
78. 
Burrow v. Arce, 997 S.W.2d 229, 241 (Tex. 1999).
79. 
Id. at 243 (rejecting a rigid approach to attorney fee forfeiture and 
listing factors to be considered by trial court, as set forth in Restatement (Second) of Trusts, § 243, 
cmt. c).
80. 
See id. at 246 (stating “trial court must determine . . . whether 
factual disputes exist that must be decided by a jury before the court can 
determine whether a clear and serious violation of duty has occurred, whether 
forfeiture is appropriate, and if so, whether all or only part of the 
attorney’s fee should be forfeited”).
81. 
Bocquet v. Herring, 972 S.W.2d 19, 21 (Tex. 1998); Tex. Civ. Prac. & Rem. Code Ann. § 
37.009 (Vernon 1997); see also Knighton v. IBM Corp., 856 S.W.2d 206, 210 
(Tex. App.—Houston [1st Dist.] 1993, writ denied) (“The award of 
attorney’s fees is not limited to the plaintiff or the party affirmatively 
seeking declaratory relief.”).
82. 
Oake v. Collin County, 692 S.W.2d 454, 455 (Tex. 1985).
83. 
See Garcia v. Martinez, 988 S.W.2d 219, 222 (Tex. 1999).
84. 
Davis v. Huey, 571 S.W.2d 859, 862 (Tex. 1978); see also Goode v. 
Shoukfeh, 943 S.W.2d 441, 446 (Tex. 1997).
85. 
Holley v. Holley, 864 S.W.2d 703, 706 (Tex. App.—Houston [1st 
Dist.] 1993, writ denied).
86. 
Black v. City of Killeen, 78 S.W.3d 686, 701 (Tex. App.—Austin 2002, 
pet. denied) (citing Comm’rs Court v. Agan, 940 S.W.2d 77, 82 (Tex. 
1997) and Barshop v. Medina County Underground Water Conservation Dist., 
925 S.W.2d 618, 637 (Tex. 1996)).